James STEWART, Appellant,

v.

The STATE of Texas, Appellee.

No. 57270.

Court of Criminal Appeals of Texas, Panel No. 2.

June 13, 1979.

Rehearing Denied Oct. 17, 1979.

Warren E. Burnett and Richard J. Clarkson, Odessa, for appellant.

Vern F. Martin, Dist. Atty., and Timothy A. Sloan, Asst. Dist. Atty., Midland, Robert Huttash, State's Atty., Austin, for the State.

Before DOUGLAS, TOM G. DAVIS and DALLY, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for voluntary manslaughter. The punishment is imprisonment for seven years.

Appellant contends that a charge on involuntary manslaughter should have been given; the trial court erroneously admitted in evidence a statement made by appellant prior to his being advised of his constitutional rights as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1960); evidence of appellant's reputation for truth and veracity was improperly excluded; the trial court erroneously instructed the jury concerning testimony by the spouse of a defendant in a criminal case; and the State committed reversible error by subpoenaing appellant's

wife as a witness, having her sworn, and having her excluded under the witness rule.

Sometime between 1:00 and 1:30 a. m. on August 20, 1976, appellant fatally shot Bobby Dean Sargent as the two stood in the office of the Red Fox Club, a restaurant and bar in Midland owned by appellant. The shooting was the culmination of an argument between appellant and the deceased over the whereabouts of a stag film belonging to the deceased. The argument began in the bar, then moved to the kitchen, where appellant struck the deceased at least once with his fist and where police later found a number of broken dishes. Appellant testified that he left the deceased in the kitchen and went to the office to call Jack Sites, who appellant believed might have the deceased's film. Appellant described the subsequent events as follows:

"Q. All right. Did you—when you went in the office, did you lock the door?

"A. I don't remember whether I closed it or locked it—I don't know. I wouldn't have locked it. I never do. But I don't even remember whether I closed it or not.

\* \* \* \* \* \*

"Q. And you were going to call Mr. Jack Sites?

"A. Yes, sir.

"Q. Well, did you start to call Mr. Sites?

"A. Yes, sir.

"Q. All right. And when you started to call Mr. Sites, did you ever on that occasion, did you get a chance to talk to him?

"A. Well, yes, sir.

"Q. All right. You talked to Sites from the little office?

"A. Yes, sir.

"Q. All right. Now when you started to dialing Sites' number, what happened?

"A. Sargent came bursting through there. And there is a lot of stuff laying around in there. And whenever he did, he scared me. He just come running in there, you know,

just like he was mad—I don't know, he kind of had a crazed look in his eyes.

"Q. Did the door fly open?

"A. I think it did—I don't remember exactly, whether the door was closed or whether it was opened.

"Q. There is evidence here that the door was forced open. Did you force it open?

"A. No, sir.

"Q. All right. And when the door opened, did the door hit you?

"A. I don't remember whether the door hit me or not.

"Q. All right. When he came in the room, what did you do?

"A. When he came running in there, he looked at me, and we kind of—he kind of grabbed at me. And I pushed him back—I had a pistol in my pocket. I pulled it out and I fired a shot. And I said, 'Now, Sargent,' I said, 'just wait.' I said, 'I'm going to get Jack on the phone so he can tell you where your films are,' I said, 'because I don't have them.'

"Q. All right. What did he do then?

"A. Well, he stood there for just a minute—or seemed like a minute, I don't know, and I'm dialing Jack. And I got Jack on the phone . .

"Q. All right. Now did you start talking to Mr. Sites?

"A. Yes, sir, I did.

"Q. Did you still have the gun in your hand?

"A. Yes, sir.

"Q. All right. What happened then?

"A. Well, Sargent, he lunged at me. And whenever he did—I was talking to Jack on the phone. And he grabbed the telephone, and grabbed me with the other hand. And I tried to swing—he got the phone loose from me. And then I remember that I was going back—I don't

know whether I fell or not, and I shot—I guess I shot again.

"Q. All right. Now if that man had got ahold of the gun, and got the gun in his possession, is there any doubt in your mind, then or now, but what you would have been a dead man?

"A. Yes, sir. I think he would have killed me.

\*    \*    \*    \*    \*    \*

"Q. Did you have any reason on earth to want to kill that man?

"A. No, sir.

"Q. Did you have any reason on earth to have the gun, other than to protect yourself?

"A. No, sir.

"Q. And when he came at you, and you standing there talking on the phone, and with the gun in your hand, was there any question in your mind but what if he got the gun away from you, that you were going to get shot?

"A. Yes, sir—he scared me. I was afraid.

"Q. All right. You are in this little bitty room. Had you invited him in the room?

"A. No, sir.

"Q. Do you even remember, as far as that's concerned, pulling the trigger?

"A. No, sir, I don't. I do the first time, but I don't remember the second time.

"Q. Were you doing anything to the man when he made this lunge at you, other than telling him that you were going to get the man on the phone, to satisfy him about them films?

"A. That's right. I told him that. And I was talking to Jack whenever he lunged at me.

"Q. And that's when the gun was fired?

"A. Yes, sir.

"Q. And you had no intention on earth to do anything, other than to protect yourself?

"A. Yes, sir."

Appellant was indicted for murder. The trial court charged the jury on the lesser included offenses of voluntary manslaughter and aggravated assault, and on the law of self-defense. Appellant contends that the trial court erred by refusing his requested charge on involuntary manslaughter.

A person commits involuntary manslaughter when he recklessly causes the death of an individual. V.T.C.A. Penal Code, Sec. 19.05(a)(1). A person acts recklessly or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. V.T.C.A. Penal Code, Sec. 6.03(c).

When we read appellant's testimony in light of Sec. 6.03(c), supra, we find no evidence that appellant acted in a reckless manner. Indeed, appellant testified that he shot the deceased in order to ward off the latter's attack. The trial court did not err in refusing to submit a charge on involuntary manslaughter. See *Brooks v. State*, 548 S.W.2d 680 (Tex.Cr.App.1977); *Scott v. State* (No. 55,659, decided May 23, 1979).

Officer David Wilks testified that he was dispatched to the Red Fox Club to check out a report of an accidental shooting. Outside the club, he met an acquaintance who told him that appellant had shot someone. Wilks entered the club, saw appellant, with whom he was also acquainted, and asked appellant what had happened. Appellant told Wilks that the deceased had locked himself in the office and shot himself, and had told appellant not to call the police. Appellant contends that his answer to Wilks' question was improperly admitted over his objection because he had not been advised of his constitutional rights.

In *Miranda v. Arizona*, supra, the United States Supreme Court stated that its decision was "not intended to hamper

the traditional function of police officers in investigating crime . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." 384 U.S. at 477, 86 S.Ct. at 1629. Although Wilks had been told that appellant had shot someone, this information was not inconsistent with the initial report of an accidental shooting. There is nothing in the record to establish that appellant had become the focus of a criminal investigation when Wilks asked him what had happened. To the contrary, it is clear from the record that appellant's statement was made during the investigatory process as a part of the general on-the-scene questioning by Wilks. The trial court did not err in admitting the statement. *Lovel v. State*, 538 S.W.2d 630 (Tex.Cr.App. 1976); *Terrill v. State*, 531 S.W.2d 642 (Tex. Cr.App.1976); *Adami v. State*, 524 S.W.2d 693 (Tex.Cr.App.1975); *Graham v. State*, 486 S.W.2d 92 (Tex.Cr.App.1972).

Appellant contends that the trial court erred by refusing to permit testimony at the guilt phase as to appellant's good reputation for truth and veracity. He argues that this testimony was admissible because Wilks' testimony concerning appellant's statement to him was in direct contradiction to appellant's trial testimony.

■ This contention is without merit. First, Wilks' testimony and appellant's testimony are not contradictory; at no time did appellant deny making the statement attributed to him by Wilks. Moreover, even if the testimony were contradictory, evidence of appellant's good reputation for truth would not have been admissible. The rule is well stated in *Wallace v. State*, 501 S.W.2d 883 (Tex.Cr.App.1973):

"In *Matthews v. State*, 80 Tex.Cr.R. 177, 189 S.W. 491, this Court, in sustaining the trial court's refusal to permit defendant to prove by two witnesses his good reputation for truth and veracity, said:

" 'The rule is well established that, if the state had attacked his general reputation for truth and veracity by any

witness, or had attempted to impeach him by proving contradictory statements, then he would have been permitted to have introduced such proof; but, until such contingency arises, the fact that he gives testimony disputing that offered by the state would make no such testimony admissible.' [Citations omitted.]

"The State had not impeached appellant by proving contradictory statements, or attacked his general reputation for truth and veracity. The fact that appellant gave testimony disputing that offered by the State would not put his general reputation in issue. No error is shown in the ruling of the trial court."

One of the witnesses subpoenaed by the State was Patsy Hill, who was present at the Red Fox Club on the night in question. As the witnesses were coming forward to be sworn at the beginning of the trial and in the presence of the jury, appellant's counsel said:

"MR. BURNETT: The Rule has been invoked, Mrs. Stewart. Would you come around and be sworn? The State has subpoenaed Mrs. Stewart, if Your honor please."

Although the record does not expressly reflect this fact, subsequent events make it clear that counsel was speaking to and about Patsy Hill.

While questioning one of the waitresses at the Red Fox Club outside the presence of the jury, the prosecutor asked about a statement made to the witness by Hill following the shooting. Appellant objected to this question. The following exchange then took place:

"THE COURT: Is Mrs. Hill going to be available to testify, I presume?

"MR. BURNETT: The State has subpoenaed her.

"MR. MARTIN: Well, we might as well get this clear, too. What is the relationship of Patsy Hill to the Defendant, do you know?

"THE WITNESS: All I know is that they are not married. They were just living together.

"MR. MARTIN: Your Honor, the attorney for the Defendant has advised the District Attorney's office that Patsy Hill and the Defendant are married, and that he will interpose that objection to the State ever calling her as a witness . . ."

Subsequently, a stipulation was entered that appellant and Patsy Hill were married, and the State neither called her as a witness nor questioned any witness in the presence of the jury concerning any statement made by her.

During his own direct testimony, appellant was asked the following questions:

"BY MR. BURNETT:

"Q. I forgot to ask you, Mr. Stewart, your wife has been subpoenaed in this case by the State or by the District Attorney's office, has she not?

"A. Yes, sir.

"Q. I have explained to you that you have a right to keep your wife from testifying in the case, haven't I?

"A. Yes, sir.

"Q. I have also explained to you that you may waive that objection, and let the State do whatever they want to about calling her as a witness, have I not?

"A. Yes, sir.

"Q. And it is your wish in Open Court to waive any such objection?

"A. That's right, sir."

Appellant contends that the State committed reversible error in subpoenaing his wife as a witness, then having her sworn before the jury and excluded from the courtroom under the witness rule. Appellant contends that this error was compounded when the trial court gave the following instruction to the jury:

"Our law further provides that the State may not call the wife of a Defendant to testify against the Defendant in any criminal trial, and further provides that this law may not be waived by the Defendant."

Appellant objected to this paragraph of the charge on the grounds that it is an improper statement of the law and constitutes a comment on the weight of the evidence, and requested that the following instruction be given:

"You are further instructed that the Defendant, in a criminal prosecution for any offense, may waive any right secured him by law, except the right of trial by Jury in a capital felony case."

Art. 38.11, V.A.C.C.P., provides that:

". . . The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution . . ."

None of the enumerated exceptions are applicable to the instant case.

It is reversible error for the State to call the defendant's wife as a witness, thereby forcing him to object in the presence of the jury, when this is done in such a manner as to convey to the jury the impression that the wife, if allowed to testify, would rebut defensive testimony previously given. *Johnigan v. State*, 482 S.W.2d 209 (Tex.Cr.App.1972); *Wall v. State*, 417 S.W.2d 59 (Tex.Cr.App.1967). In *Clayton v. State*, 465 S.W.2d 769 (Tex.Cr.App.1971), on the other hand, we held that while the prosecutor erred in having the defendant's wife sworn as a witness in order to have her excluded from the courtroom under the witness rule, this error did not require reversal.

There is nothing in the record to indicate that the State, at the time the subpoena for Hill was issued, was aware of the fact that she was appellant's wife. Moreover, it was appellant's counsel who drew the attention of the jury to the fact that Hill was married to appellant and had been subpoenaed as a witness, and who, in his questioning of appellant, sought to emphasize the State's failure to call Hill by having appellant waive any objection to her testifying. We hold that, under the circumstances, the State did not commit reversible error in having Hill subpoenaed, sworn, and excluded under the witness rule.

■■ We also hold that the trial court did not err in giving its instruction to the jury concerning testimony by the defendant's spouse and in refusing appellant's requested instruction. Contrary to appellant's contention, the prohibition against adverse spousal testimony is not a right which may be waived by a defendant under Art. 1.14, V.A.C.C.P. The disqualification of a spouse as an adverse witness cannot be waived. *Johnigan v. State*, supra; *Carabajal v. State*, 477 S.W.2d 640 (Tex.Cr.App. 1972); *Krzesinski v. State*, 169 Tex.Cr.R. 178, 333 S.W.2d 149 (1960); *Bush v. State*, 159 Tex.Cr.R. 43, 261 S.W.2d 158 (1953). The instruction given by the trial court is a correct statement of the law. It does not comment on the weight of the evidence, nor does it give any indication of the trial court's opinion of the case. These grounds of error are overruled.

The judgment is affirmed.

Before the court en banc.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

ONION, Presiding Judge.

On rehearing appellant urges this court did not properly dispose of his contention that the trial court erred in refusing to allow him to call witnesses at the guilt stage of the trial to testify as to his general reputation for truth and veracity. In the State's case-in-chief officer Wilks testified that when he arrived at the scene of the homicide he asked the appellant what happened and was told that the deceased had said not to call the police, had locked himself in the office and shot himself. After the State rested its case-in-chief, the appellant testified that after an argument the deceased had rushed into the room where he (appellant) was, and that acting in self-defense, he shot and killed the deceased. On cross-examination, no questions were asked of the appellant about the statement officer Wilks related that appellant made to him.

It is appellant's contention that officer Wilks' testimony concerning the statement made by the appellant at the scene of the shooting was inconsistent with appellant's later testimony and thus placed appellant's credibility in issue and justified appellant's request that he be allowed to call witnesses as to his reputation for truth and veracity.

■ The general rule is that where there is no evidence except contradictory evidence, it is not permissible to bolster the testimony of the witness by proof of his good reputation for truth and veracity. See *Rodriguez v. State*, 165 Tex.Cr.R. 179, 305 S.W.2d 350 (1957), and cases there cited.

In 62 Tex.Jur.2d, Witnesses, § 241, p. 192, it is stated:

"Unless testimony should be admissible on the ground that it is corroborative as to what a witness has testified to on some material issue, the rule, both in civil and in criminal cases is that impeachment of the witness by the adverse party is an essential prerequisite of the calling of witnesses to sustain him in one of the recognized ways. Applying this principle, it has been ruled that it is not permissible to introduce evidence . . . that the witness has a good reputation for veracity until his veracity has been impeached . . . . ."

In § 242 of the same authority, it is written:

"In conformity with the import of the terms 'impeach' and 'contradict' in this department of the law, a witness may not be supported merely because testimony in conflict with his has been introduced. To authorize the introduction of supporting testimony the witness must have been impeached in the sense that he is charged with fabricating testimony or of testifying falsely; or an attempt must have been made to show that he made a prior statement in conflict with his testimony, or has conducted himself inconsistently therewith . . . ."

In § 284 of the same authority at p. 269, it is written:

"Unless a proper predicate has been laid it is not competent for a party to show that his witness bears a good reputation for veracity, for to admit that tes-

timony without the witness's having been impeached would be to introduce an unnecessary collateral issue.

"In accordance with the general rule, mere conflict in the evidence is not a sufficient predicate . . . ."

The appellant contends the general rule should not be applicable to him in light of officer Wilks' testimony in the State's case-in-chief and his own subsequent testimony.

In *Mitchell v. State*, 156 Tex.Cr.R. 128, 239 S.W.2d 384, 389 (1951), a fact situation similar to the instant case, this court wrote:

"Bill of Exception No. 12 is leveled at the failure of the trial court to permit appellant to offer character witnesses' testimony as to his good reputation for truth and veracity.

"The State, in making out its case, proved by two peace officers that upon their arrival at the scene of the homicide appellant made to them a statement as to his reason for having committed the same. When defendant took the stand, he denied having made such a statement to the officers and assigned another reason for having fired the fatal shot. Appellant claims this to be a sufficient predicate for the introduction of testimony supporting his reputation for truth and veracity and relies heavily upon *Stillwell v. State*, 104 Tex.Cr.R. 338, 283 S.W. 840. In that case the State had made out its case in chief; appellant had testified; had been cross-examined; and in rebuttal the State offered a confession containing statements inconsistent with appellant's testimony. Following this, appellant offered witnesses to support his reputation for truth and veracity. These, the trial court refused to hear. Judge Lattimore pointed out that by virtue of the order of the above procedure, the *State* having made the issue as to the contradictory statements of appellant, he was therefor impeached and the testimony as to his reputation for truth and veracity should have been heard. The Court went further in that case and discussed *White v. State*, 42 Tex.Cr.R. 567, 62 S.W. 575, approving the holding therein.

"In the *White* case the State introduced against the accused, as a part of its case in chief, statements made by him with reference to the crime. He took the stand and swore to the contrary. He then sought to bolster his testimony by that of other witnesses. In differentiating between the *Stillwell* and *White* cases, the Court said: 'The clear distinction is that in such case the state offers no contradictory statements to those made by appellant, but proves as original testimony his declarations and statements, and that he cannot thereafter put his character in evidence by testifying in his behalf to facts contradictory to those offered by the state.' [104 Tex.Cr.R. 338, 283 S.W. 843].

"To sustain appellant's contention would be to authorize every defendant to bolster his defense with witnesses as to his reputation for truth and veracity by the simple expedient of disagreeing with the State's version of the case. The defendant himself may not create the contradiction or impeachment and profit thereby."

See also *Wallace v. State*, 501 S.W.2d 883 (Tex.Cr.App.1973), quoted with approval in our panel opinion on original submission.

We remained convinced that this matter was properly disposed of on original submission.[1]

Appellant's motion for rehearing is overruled.

---

[1] It should be noted that the opinion on original submission should not be interpreted, as appellant does according to his brief, as implying that a defendant or other witness must first deny making a prior inconsistent statement before the rule in question comes into play. It may be triggered by other means as well. See 62 Tex.Jur.2d, Witnesses, § 284, p. 271.