**Gilbert Hernandez
AGUILAR, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 966–83.**

Court of Criminal Appeals of Texas,
En Banc.

June 18, 1986.

---

Arch C. McColl, III, S. Michael McColloch, David W. Coody, Rod Ponton, Dallas, for appellant.

Henry Wade, Dist. Atty., Karen Chilton Beverly, Janis Warder & Steven Miller, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

CLINTON, Judge.

Appellant was indicted for murder. On his plea of not guilty he was convicted by a jury of voluntary manslaughter. At punishment the State offered one prior conviction and the jury assessed punishment at life imprisonment.

Appellant asserted selfdefense. The State called as a witness Mildred Williams, who lived with appellant at the time of the offense. Appellant objected to her being called on the ground that Williams was his common law wife. The trial court found after a pretrial hearing that the witness was not the common law wife of appellant, and refused appellant's request to submit the issue to the jury. The Dallas Court of Appeals held this ruling to be harmless error. *Aguilar v. State,* 658 S.W.2d 802 (Tex.App.—Dallas 1984). We granted appellant's petition for discretionary review to examine that holding.

The evidence at trial showed that appellant and the witness Ms. Williams lived together at the Alamo Plaza Hotel in Dallas. On Thanksgiving Day, 1981, they had invited several friends and relatives to their small two room apartment. Some time after the meal began that evening the deceased arrived. Witnesses described him as loud, very drunk, and obnoxious; the deceased stayed on after the other guests had departed. Appellant did not testify at trial but his statement to police was introduced into evidence after the trial court

found it to be voluntary. According to that statement, appellant began cleaning up and taking trash out of the apartment. When he returned to the kitchen he found that the deceased "had his hands on Mildred." Appellant didn't say anything, but when the same thing happened again appellant took a shotgun from the closet and told the deceased to leave. According to appellant's statement the deceased stood up, said something threatening, and took a step toward appellant. "I thought [the deceased] was going to jump me." Appellant raised the shotgun and fired once, killing the deceased.

The only other witness to the shooting was Mildred Williams. Appellant objected to her testimony, claiming she was disqualified to testify against him because she was his common law wife. A pretrial hearing was held, after which the trial court allowed her testimony. Appellant requested a charge to the jury on the law of common law marriage, and an instruction that if the jury found Williams to be appellant's common law wife they should disregard her testimony. See *Huffman v. State,* 450 S.W.2d 858 (Tex.Cr.App.1970). The requested instruction was denied.

Our first inquiry is whether appellant put on sufficient evidence to raise the issue of common law marriage. We find that the issue was raised. Mildred Williams gave the following testimony in the pretrial hearing:

"Q: Mrs. Williams, I want to ask you, were you living together with Mr. Aguilar as husband and wife?

A: Yes.

Q: Did you intend to get married?

A: Yes, sir, we did.

Q: And I say, 'married;' by a justice of the peace or a preacher or actually getting a marriage license? Did you intend to do that?

A: Yes, we did...

Q: I'll ask you whether you ever represented to other people that Gilbert Aguilar was your husband?

A: Yes..."

Q: Did you ever introduce him as your husband?

A: Yes, I have...

Q: Do you presently intend to marry this man?

A: Yes, sir."

Williams gave essentially the same testimony before the jury:

"Q: And did y'all live together as husband and wife?

A: Yes.

Q: Did you hold yourself out to others as being husband and wife?

A: Yes.

Q: Did you have an agreement to be married?

A: Yes, we did.

Q: Why weren't you married legally at that time?

A: Well, for economic reasons..."

Other defense witnesses testified to the same effect, including appellant's brother:

"Q: And you know that—of your own knowledge that they were living as man and wife with intentions of marriage?

A: Yes, sir."

The State contradicted appellant's assertion with the testimony of police officers who had been called to the scene of the shooting. The officers testified that Williams had identified herself at the scene as appellant's girlfriend, rather than wife, and had given as her address one other than appellant's.

At the end of the pretrial hearing the trial court announced, "What you have proved is an engagement, intention to get married at some future time, not a marriage. Mildred is not a common-law wife, in this Court's opinion."

■ The trial court appears to have well understood the law of common law marriage. However, its opinion as to whether one existed in this case is not determinative. The proper procedure would have been the one appellant requested, to submit the issue to the jury, with an instruction to

disregard the witness's testimony if they found she was the common law wife of appellant. *Huffman,* supra. "The existence of a common law marriage is an issue of fact to be determined by the trier of fact," *Hightower v. State,* 629 S.W.2d 920 (Tex.Cr.App.1982). See also *Brooks v. State,* 686 S.W.2d 952 (Tex.Cr.App.1985). The right to have the issue presented to the jury may be waived if such an instruction is not requested, *Hightower,* supra; *Krzesinski v. State,* 169 Tex.Cr.R. 178, 333 S.W.2d 149 (1960), but that was not the case here.

It is not necessary for the trial court to give the issue to the jury if it has not been raised by the evidence. *Lackey v. State,* 638 S.W.2d 439 (Tex.Cr.App.1982). In *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr. App.1978), the evidence showed that the witness who was the alleged common law spouse of the defendant was in fact already married to another man. Thus as a matter of law she could not have entered a common law marriage with the defendant, and there was no error in the trial court's refusal to submit the issue to the jury.

■ In the instant case, however, the issue was raised by the evidence, both in the pretrial hearing and before the jury. The elements of a common law marriage are:

(1) living together as husband and wife;

(2) the parties' representing to others that they are married; and

(3) an agreement to be married.

V.T.C.A. Family Code, § 1.91(a)(2).

The third element seems to have been a matter of some confusion in the criminal law of this State for the last forty years. The civil cases cite the element properly, an agreement *to be* married. *Claveria's Estate v. Claveria,* 615 S.W.2d 164 (Tex. 1981); *Collora v. Navarro,* 574 S.W.2d 65 (Tex.1978). The criminal cases, though, usually list this requirement as an agreement *to become* married. *Bodde, Hightower,* both supra. Judge McCormick tracked down the apparent source of this confusion in his opinion in *Lackey,* supra. The

source of the "becoming" language seems to be *Welch v. State*, 151 Tex.Cr.R. 356, 207 S.W.2d 627 (1948), which cited a 1927 civil case, *Texas Employers Insurance Association v. Soto*, 294 S.W. 639 (Tex.Civ. App.—El Paso 1927, writ dism'd). The latter case held:

> "To constitute the marital relation of husband and wife at common law... there must be a mutual assent or agreement, express or implied, between the man and woman to become then and thenceforth husband and wife and, pursuant to such consent or agreement, followed up by a living together in such agreed relationship." *Id.*, at 640.

*Welch* in citing this passage left off the phrase "then and thenceforth," and it has been left off ever since. *Lackey*, supra, at 443. This has led to the misconception that the third element of common law marriage is an agreement to become married at some time in the future. That is not the case. The confusion has been exacerbated by the language of some cases that the parties must have an intention to be presently married. "Presently" is defined as both "before long: without undue delay" and as "at the present time: now," Webster's New Collegiate Dictionary, 1979. It is the latter definition that applies to this element. A present intention to be married in the future is not enough. The parties must intend to be husband and wife from the moment of the agreement onward. "Present agreement to be married is a necessary element of common law marriage and it is not sufficient to agree on present cohabitation and future marriage," *Rosetta v. Rosetta*, 525 S.W.2d 255 (Tex.Civ.App.— Tyler 1975, no writ).

It is not clear appellant's counsel understood this distinction. While some of Williams' testimony evinces an agreement between herself and appellant to be already married, other testimony showed an agreement to be married by "actually getting a marriage license" at some time in the future. Appellant's counsel in eliciting this testimony seems to have fallen into the trap laid by *Welch*, supra, in 1948.

■ The testimony that appellant and Williams planned to be married "by a justice of the peace or a preacher" at some time in the future is not, however, conclusive evidence that no common law marriage existed already. Section 1.91(b) of the Family Code says, "the agreement of the parties to marry may be inferred if it is proved that they lived together as husband and wife and represented to others that they were married." Williams testified to both the elements that give rise to the inference of agreement, as well as to the fact that she and appellant considered themselves already married, *and* to their intention to be ceremonially married some time in the future. It is true this may raise competing inferences. However, an intention to be ceremonially married on some future occasion does not necessarily negate the inference that the parties believe they are already married by common law. "The fact that the parties were to live together as husband and wife in accordance with their agreement to do so, and at some time in the future, when their affairs made it feasible or practical they would solemnize their relation by engaging in a lawful ceremony, cannot be construed into a modification of the marriage agreement, rendering it void and condemning them to a life of unlicensed sin," *Trammell v. Trammell*, 196 S.W.2d 209 (Tex.Civ.App.—San Antonio 1946). If Williams and appellant had agreed that they were already married, a future ceremony would be only a reaffirmation of that promise, and of the already existing marriage. In this state of the evidence, the issue should have been submitted to the jury.

Recognizing this error on the part of the trial court, the court of appeals ruled it was harmless. Appellant now responds that "[s]pousal incompetency cannot be waived by a defendant and, thus, is not subject to a harmless error analysis[,]" but that in any event, assuming such analysis to be appropriate, the harm in this case is evident. We will examine both of these contentions in turn.

Appellant argues that because the disqualification of a spouse as an adverse witness under V.A.C.C.P., Article 38.11 [1] cannot be waived, see *Stewart v. State*, 587 S.W.2d 148 (Tex.Cr.App.1979) and *Johnigan v. State*, 482 S.W.2d 209 (Tex.Cr.App. 1972), it follows that it is inappropriate to apply a harm analysis to testimony admitted in violation of the prohibition. Ergo, it was error for the court of appeals to examine the harmfulness of the trial court's failure to give his requested *Huffman* charge. We disagree.

■ That spousal disqualification cannot be waived where the State calls the spouse of an accused simply means no contemporaneous objection is required to preserve error for appeal. This does not necessarily preclude application of a harm analysis. That heretofore the cases seem not to have expressly undertaken a harm analysis is simply reflective of the fact that it will be the rare case in which calling the accused's spouse to testify against him could *not* possibly contribute to his conviction, rather than that a harm analysis is *per se* inappropriate. Furthermore, in situations wherein the mere calling of a spouse to testify for

the State has not been found to create the impression that the spouse would give damaging testimony, we have not reversed convictions, irrespective that *Johnigan v. State*, supra, at 211, found this error *also* to be unwaivable. See *Stewart v. State*, supra; *Clayton v. State*, 465 S.W.2d 769 (Tex.Cr.App.1971); *Rogers v. State*, 687 S.W.2d 337, 343 (Tex.Cr.App.1985) (Davis, W.C., J., plurality opinion).[2]

The court of appeals drew a useful, if imperfect, analogy to *Stephens v. State*, 522 S.W.2d 924 (Tex.Cr.App.1975). In affirming the conviction in *Stephens* this Court performed a harm analysis when the State, over objection, exceeded the scope of proper crossexamination of a spouse called to testify *on behalf* of the accused. Such a spouse may be crossexamined within the bounds of those matters elicited during direct examination, but the State may not go into "new incriminating evidence." See also *Firo v. State*, 657 S.W.2d 141 (Tex.Cr. App.1983); *Shirley v. State*, 501 S.W.2d 635 (Tex.Cr.App.1973); *Newby v. State*, 384 S.W.2d 133 (Tex.Cr.App.1964); *Dollinger v. State*, 156 Tex.Cr.R. 397, 242 S.W.2d 891 (1951).[3] It appears the Court in *Stephens*,

1. Article 38.11 reads in relevant part:
   "The husband and wife may, in all criminal actions, be witnesses for each other, but ... they shall in no case testify against each other in a criminal prosecution."

2. It should also be noted that the particular error asserted in this cause, *viz.*, failure to give a *Huffman* charge as requested, *has* been deemed waivable by this Court. *Hightower v. State*, supra, at 924.
   We further observe that, this being an assertion of error in the jury charge, which error was preserved by requested instruction, "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant," V.A.C.C.P., Article 36.19, "which means no more than that there must be *some* harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Cr.App.1985). (Emphasis in original.)

3. To the extent that *Shirley*, supra, might be read for the proposition that a spouse's testimony which, though incriminating, is also cumulative of the testimony of *other* witnesses, and therefore harmless, it should be overruled. Because such incriminating testimony comes from the lips of appellant's spouse, it takes on a prejudicial value beyond the meaning of the

mere words, which prejudice does not disappear simply because the testimony is cumulative.
   A careful reading of *Shirley's* progenitors does not support such a reading anyway. In *Taylor v. State*, 74 Tex.Cr.R. 3, 167 S.W. 56, 61 (1914) (Opinion on motion for rehearing) the Court observed:
   "[I]t has always been held that when the husband who is on trial introduces his wife to testify in his behalf, and she does so, she is subject to cross-examination just like any other witness, save and except that new incriminating evidence cannot be brought out against the accused by her, and that she can be impeached in the same way and to the same extent as any other witness can be."
   Further, the *Taylor* Court quoted approvingly from an opinion of the Supreme Court in *Creamer v. State*, 34 Tex. 174, thus:
   "We are therefore of the opinion that whenever a husband or wife is put upon the witness stand to testify in behalf of the other, he or she so testifying should be subjected to as rigid a cross-examination as any other witness, with the exception only that he or she could not be examined in regard to anything against the other about which there had been no testimony *on the examination in chief*." [Emphasis supplied.]

supra, found the improper questions not to have been incriminating, and hence, "not so harmful as to require reversal." 522 S.W.2d at 927.

In a case such as *Johnigan v. State*, supra, harm inures in the mere calling by the State of the spouse of the accused in any manner which communicates to the jury that the spouse will testify adversely to his cause. See also *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); *Wall v. State*, 417 S.W.2d 59 (Tex.Cr.App.1967); *Davis v. State*, 160 Tex.Cr.R. 138, 268 S.W.2d 152 (1954); *Davis v. State*, 140 Tex. Cr.R. 597, 146 S.W.2d 994 (1941). When as in *Stephens*, supra, the defendant himself places his spouse on the witness stand, obviously the State does not generate the same impression *ab initio*. Only when the State elicits "new" evidence from the spouse does error accrue.[4] And, in this context it is sensible to conclude, only if that new evidence is "incriminating" or detracts from any defensive evidence established otherwise than by the spouse's own direct testimony, will that error be harmful, thus requiring reversal.

■ Likewise, under the instant scenario there can be no harm predicated upon the witness initially taking the stand. Because there was an issue for the factfinder whether the witness was indeed appellant's common law wife, it was inevitable that she should testify. Indeed, in requesting a *Huffman* charge appellant did not dispute the propriety of having his purported wife testify. He objected, rather, that the jury was not equipped to discount that testimony should it have believed she was his wife. Thus, the *Huffman* procedure presupposes that the potential harm is not so egregious it cannot be cured by the instruction to

disregard. As in *Stephens v. State*, supra, if the testimony of the purported wife was not in some way "incriminating," i.e., if it could not possibly have contributed to appellant's conviction, we see no interest that could be vindicated by reversal. For this reason we conclude that it was appropriate for the court of appeals to have conducted the harm analysis in this cause.

Having so concluded, we are compelled to disagree with the court of appeals in its holding that Williams' testimony was harmless beyond a reasonable doubt.

Appellant in the instant case did not deny shooting the deceased, but claimed to have acted in selfdefense. The only other person present in the small room at the time of the shooting was Williams, appellant's alleged common law wife. When the State called Williams as a witness she testified that she had not been paying attention to appellant and the deceased before the shotgun was fired. The shooting took place some time after eight o'clock at night and Williams had been drinking since ten that morning. She was in pain from an abscessed tooth and tired from having made Thanksgiving dinner for twelve people. Her testimony was essentially that she had heard or seen nothing to rouse her attention or apprehension until the shotgun was actually fired:

"A: [By Williams] I saw him [appellant] go to the closet and if he got the gun out I thought maybe he might be just showing Doug [the deceased] the gun or something. It never dawned on me that they had got in an argument or anything...

Q: Isn't it a fact that Mr. Aguilar wasn't acting mad or showing any emotion?

Reading these passages conjunctively, it is clear that by *"new* incriminating evidence" the *Taylor* Court meant testimony not previously elicited by the spouse during *her* direct examination. See also *Roberts v. State*, 74 Tex.Cr.R. 150, 168 S.W. 100 (1914). In other words, the crossexamination must actually exceed the scope of the spouse's direct testimony and be incriminating for reversible error to accrue. If these conditions are met, however, it makes no difference

that her "new incriminating evidence" is also cumulative of other witnesses' testimony.

This said, it must be pointed out that the result in *Shirley* may nevertheless be justified in that the Court found the spouse's testimony to have been nonincriminating. 501 S.W.2d at 638. See also *Jones v. State*, 156 Tex.Cr.R. 2, 238 S.W.2d 529 (1951); *Newby v. State*, supra; *Stephens v. State*, supra.

4. See n. 3 *ante*.

A: Well, if they were, I didn't notice it...

Q: Isn't it a fact that you told the police that you don't know why Mr. Aguilar shot Doug?

A: If they had any words, I didn't hear it.

Q: You don't know why—

A: That's right.

Q: —why he shot him, do you?

A: I don't."

The court of appeals characterized this testimony as "neither incriminating nor exculpatory," and therefore harmless to appellant.

The proper standard for this inquiry is whether the objectionable evidence was harmless beyond a reasonable doubt, i.e., whether there is a reasonable possibility the evidence contributed to the conviction. *Clark v. State*, 627 S.W.2d 693 (Tex.Cr. App.1982); *Dove v. State*, 623 S.W.2d 346 (Tex.Cr.App.1981). Though it is true that Williams' testimony was negative rather than assertive, that does not render it harmless. Appellant's only defense was selfdefense. Williams was the only witness to the encounter between appellant and the deceased that took place in a room ten feet by ten feet. The argument began, according to appellant, over the deceased's physical attentions to Williams. From there it quickly escalated until appellant was allegedly so afraid that he shot the deceased in selfdefense. Williams testified that she noticed none of this.

The burden of raising selfdefense is on the defendant, after which the State must disprove it beyond a reasonable doubt. V.T.C.A. Penal Code, §§ 2.03, 9.02, 9.31. That was obviously the State's purpose in calling Williams as a witness. If an argument becomes so heated or an encounter so threatening that a man fears for his life or safety, another person in the same ten by ten foot room should be aware of it. Williams testified that she was not. Thus her testimony inferentially rebutted the only defense raised at trial.

That the State intended to put her testimony to such use is manifested in the prosecutor's closing remarks. He characterized Williams' testimony thus:

"The only witness to this offense, Mildred Williams, says, 'I don't know why the Defendant shot Mr. Douglas.' Nothing about, 'He was putting his hands on me,' or 'They got into a struggle,' or 'He took a step towards the Defendant.'

And then what did she say later on? 'I couldn't believe that it happened.'

Now, what does that show you? It shows you a cold-blooded murder in this case, which is exactly what we've charged him with."

The State clearly had a use for Williams' testimony, and it is disingenuous of the State now to argue otherwise. Under these circumstances we cannot find that the trial court's refusal to submit the common law marriage issue to the jury was harmless. *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr.App.1985).

The judgments of the court of appeals and the trial court are reversed and the cause is remanded for new trial.

ONION, P.J., and TEAGUE, J., concur in result.