**Russell TURNER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09 86 098 CR.**

Court of Appeals of Texas, Beaumont.

March 11, 1987.

Petition for Discretionary Review April 8, 1987.

G. Patrick Black, Sparks & Hawthorne, Beaumont, for appellant.

John R. DeWitt, Asst. Crim. Dist. Atty., Beaumont, for appellee.

OPINION

BURGESS, Justice.

A jury found Russell Turner guilty of murder. He elected to have the court assess punishment. After a pre-sentence in-

vestigation, the court sentenced appellant to life in the Texas Department of Corrections. Appellant brings forth three points of error.

Appellant first alleges the evidence is insufficient to support his conviction for murder; he maintains that if he is guilty of any criminal offense, it is voluntary manslaughter and not murder. On appeal, we review the evidence in the light most favorable to the verdict. *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984). We must uphold the verdict if, after that review, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Carlsen v. State*, 654 S.W.2d 444 (Tex.Crim.App.1983). Further, our review is predicated on great deference for the jury's decision. *Schuessler v. State*, 647 S.W.2d 742 (Tex.App.—El Paso 1983) *rev'd on other grounds*, 719 S.W.2d 320 (Tex.Crim.App.1986).

■ The difference between the offense of murder, *TEX.PENAL CODE ANN. sec. 19.02* (Vernon 1974), and voluntary manslaughter, *TEX.PENAL CODE ANN. sec. 19.04* (Vernon 1974) is the latter's requirement that death ensue the immediate influence of sudden passion arising from an adequate cause. When evidence raises the issue of sudden passion, its negation becomes an implied element of murder that the state must prove beyond a reasonable doubt. *Bradley v. State*, 688 S.W.2d 847 (Tex.Crim.App.1985). In such a case, the jury should be charged that the burden of proving the absence of sudden passion is upon the state and not the defendant. *Cobarrubio v. State*, 675 S.W.2d 749 (Tex.Crim.App.1983). *See Lawrence v. State*, 700 S.W.2d 208 (Tex.Crim.App.1985).

Appellant and his wife were having marital difficulties in the fall of 1984. Appellant had filed for divorce and moved from the family home in Port Arthur, Texas to his brother's home in Houston, Texas. They continued to talk about a reconciliation and on the afternoon of September 20, 1984, appellant was in Port Arthur visiting his family. Appellant talked to his wife and was told she would telephone him in Houston later that evening. Appellant re-

turned to Houston and sometime after midnight called his mother-in-law's home trying to contact his wife. The mother-in-law informed appellant that his wife was not there. Appellant then asked if he could use his brother's car to go to the store. The brother agreed and appellant left. Appellant then drove to his home in Port Arthur.

Upon arriving, appellant saw an unfamiliar car parked behind the home. Appellant then parked some distance away and walked to the front door. He began beating on the door with his fist and succeeded in knocking the door open. Appellant ran to the bedroom, turned on the lights and discovered a nude man getting out of the bed. The wife was laying in the bed. Appellant pulled a knife and began stabbing the man. According to the physical evidence, appellant began stabbing the man on the bed, continued stabbing the man throughout the house, out into the yard and finally in the man's car. A pathologist testified the deceased suffered 22 stab wounds, three of which were potentially fatal. Appellant then called his mother-in-law telling her, "I just killed a nigger." He then telephoned the operator requesting the police and an ambulance. When the police arrived, they found the deceased lying in the back yard. While patting down appellant, they found a pair of gloves and the knife in his pocket. Sometime during the episode, appellant had put on the pair of leather gloves.

At first blush, this appears to be the classic case of sudden passion in the Old South. A husband, seeking reconciliation, returns home to find his wife in bed with a nude man of another race. Appellant took the stand and testified he began to get "real upset" and felt "real panicky" when he saw the car parked behind the house. Further, when he saw the nude man in bed with his wife he just pulled out the knife and started stabbing him. He also said that he did not remember much after that until the police arrived that the whole episode went "so fast" and that he just "went crazy."

The state rebutted appellant's contention of sudden passion by pointing out that appellant lied to his brother about using the car to go to the store. Further, appellant parked the car some 168 feet across a drainage ditch from the house; the inference was that appellant was suspicious of his wife and was seeking a confrontation. This contention was furthered by the appellant's putting on gloves. The state argued that this inferred appellant was expecting some type of trouble or was attempting to avoid leaving fingerprints.

Appellant's expert witness provided particularly damaging testimony on the issue of absence of sudden passion. He stated:

Q  Now as a result of your examination with the defendant and the conversations with Mr. Turner, what specifically did he relate to you?

A  Mr. Turner had difficulty relating these things to me. What he told me was that he and his wife had been separated for some period of time, that they had worked out an arrangement to participate in a reconciliation effort and that he was living in Houston with a relative. He came home and as he was coming home he saw this car parked in an obtrusive way in the back yard of the house. He was concerned about what happened and maybe that is a light term, concerned. When he saw the car, anger, anticipation, frustration of what does all this mean. The lights were out, the air conditioner was running. Thoughts flashing through his mind. He drove around for a moment, parked his car, put on some gloves, anticipating. I don't know at that point if he knew what he was anticipating. Burst into the house, went into the bedroom, turned on the lights, and a gentleman was in bed with his estranged wife. Wife, whatever that meant to him. Turned on the light and at that point his memory becomes very fragmented. At one time when he was in my office he can remember events and another time he has difficulty remembering events. He says that he began to stab this person. He remembers the person saying one time he was just leaving. He follows the person out of the house towards the car. He remembers somehow the knife got out of his hand at one point, and he later found it in the house. He remembers hitting this person. He remembers either asking someone to call an operator and seek assistance. As he thinks back he remembers thoughts of, God, please don't let this guy die. He is concerned about whether the person dies. The police come and the ambulance comes. And he tells them where the knife is because he saw it when he went back inside the house. In a brief way, counsel, that is essentially what he told me.

. . . .

Q  During your conversations with Mr. Turner did he relate to you that he had tried to call the house from Houston and no answer?

A  Yes, sir, he did.

Q  That he got in the car and went to Port Arthur to find his wife?

A  Obviously the case.

Q  And seeing the car where it was parked and how it was parked, did he relate to you that this caused some type of suspicion within him?

A  That is exactly probably the appropriate word. If he had seen the car parked in the driveway in an appropriate way it would not have raised the amount of suspicion that it did. But to see it secluded, obtrusively in the back yard, that begins to raise that emotional response.

Q  Does the fact that he suspects that his wife may be with some other man, does it take—does that fact take it out of the classification of—or does it take away from how he reacted at the time that he turned the light on and actually found his wife in bed with another man?

A  Certainly it does because he has had time to reflect, maybe build an inordinate amount of stress and anxiety and it winds the string tighter. It winds the rubber band tighter. And his responses are less predictable at that point.

■ The jury must decide whether adequate cause existed at the time of the killing. *Newman v. State*, 501 S.W.2d 94

(Tex.Crim.App.1973). It must also decide the credibility of the witnesses and the weight to be given their testimony. *Franks v. State,* 712 S.W.2d 858 (Tex.App. —Houston [1st Dist.] 1986, no pet.). Based upon the evidence cited above, along with other instances in the record, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the state disproved "sudden passion." Point of error number one is overruled.

Point of error number two complains of alleged improper jury argument. The trial court, however, sustained the objection to the argument and instructed the jury to disregard. This cured any possible error. *Hodge v. State,* 631 S.W.2d 754 (Tex.Crim. App.1982). This point of error is overruled.

The final point of error alleges fundamental error occurred when the state implied that appellant's spouse would testify to appellant's detriment. The complaint arises from three exchanges.

On Cross-Examination:
Q Well, wasn't one of the marital problems the fact you wanted her to go out with a bandido friend of yours? Isn't that a fact?
A No, sir. No, sir.

On Re-Direct Examination:
Q Now also for purposes of clarity, did you try to get your wife to go out with a friend of yours that was member of the bandidos?
A No, sir.

On Re-Cross Examination:
Q As far as the incident or alleged incident with Mary Helen and the bandido, of course, she would know one way or another if that was true?
[DEFENSE COUNSEL]: Objection, Your Honor. That is an improper question concerning this man's wife to him.
THE COURT: Sustain the objection.
[DEFENSE COUNSEL]: I ask that the jury be instructed to disregard it, your Honor.
THE COURT: The jury will disregard any comment about the defendant's wife.
[DEFENSE COUNSEL]: I would ask for a mistrial, your Honor.

THE COURT: Mistrial denied.

■ Any error in asking an improper question may be cured or rendered harmless by an instruction to disregard unless the question "is clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds." *Guzmon v. State,* 697 S.W.2d 404, 408 (Tex.Crim.App.1985). This is equally true of a question concerning a possible violation of the spousal disqualification, since such a violation is subject to a harm analysis. *Aguilar v. State,* 715 S.W.2d 645 (Tex.Crim.App.1986). The instruction by the trial court cured any possible harm. This point of error is overruled. The judgment of the trial court is affirmed.

AFFIRMED.

BROOKSHIRE, Justice, concurring.

I concur. Since the Appellant alleges that the evidence is insufficient to sustain his conviction of murder, I think it is important to stress that, in both direct and circumstantial evidence cases, the reviewing court properly will look at all the evidence in a light most favorable to the verdict. Also, no longer does an appellate court review the evidence in the light of the presumption that the accused is innocent. In *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App.1984), the Court of Criminal Appeals specifically held:

"All cases containing the language that review of the evidence 'in light of the presumption that the accused is innocent' are expressly overruled."